*In re* FARMERS' & MERCHANTS' BANK OF LAWRENCE.

SMITH *v*. MOSIER.

1. RECEIVERS—PROPERTY RIGHTS—SET-OFF AND COUNTERCLAIM.

It is well settled in this State that a receiver succeeds only to the title and right to property which the person, firm, or corporation he represents had at the time of his appointment, subject to all existing liens and equities, including the equitable right of set-off.

2. SAME—SET-OFF—BURDEN OF PROOF.

In proceedings to establish a claimed set-off against a note in the hands of the receiver of a banking copartnership for services rendered in securing subscriptions to the stock of a banking corporation to be organized for the purpose of taking over the business of the copartnership, the burden of proof rested upon claimant.

3. PLEADING—AMENDMENTS—DISCRETION.

There was no abuse of discretion by the court below in allowing the receiver to amend his answer so as to render admissible testimony that claimant falsely represented to those he solicited that the bank was paying well, and that he was to receive no pay for selling the stock.

4. EVIDENCE—FRAUD—CREDIBILITY.

Evidence of such representations would be material if they were inducing false representations rendering void the subscriptions for stock, and, being contradictory to his testimony in support of his claim at the hearing, was admissible as to his credibility.

5. CONTRACTS—CONSTRUCTION—COMPENSATION—EQUITY.

Where said claim is based upon a contract made with one member of the copartnership, providing that claimant is not "bound further than to procure the subscriptions in their entirety" before a certain date, and said copartnership is bound no further than "to pay said second party five per cent. commission on the sale of all stock sold," yet, where the organization of the contemplated corporation was never completed, and the copartnership never

received any benefit from the efforts of claimant, in the light of what the contracting parties then had in mind, it was equitable and legally permissible for the court below to construe the contract as meaning that his compensation was contingent on the bank's being incorporated.

6. SAME—PARTNERSHIP—CONSENT OF PARTNERS—SCOPE OF BUSINESS.

In the absence of evidence tending to show that the other members of the partnership knew of, or gave their consent to, the contract as claimed by claimant, the contracting partner had no authority to bind his copartners; such contract not being within the immediate scope of the partnership business.

Appeal from Van Buren; Des Voignes, J. Submitted June 14, 1916. (Docket No. 110.) Decided December 22, 1916.

Petition by W. B. Smith against William C. Mosier, receiver of J. L. Welch & Company, for an accounting, the cancellation of certain notes, and other relief. From a decree for defendant, petitioner appeals. Affirmed.

*David Anderson,* for petitioner.

*Thos. J. Cavanaugh,* for defendant.

STEERE, J. On March 30, 1914, the private banking firm of James L. Welch & Co., a copartnership doing business at Lawrence, Mich., under the name "Farmers' & Merchants' Bank," being insolvent, closed its doors and went into the hands of a receiver for liquidation. It was hopelessly insolvent as early as December 1, 1913, and later ascertained that its assets would not pay to exceed 35 per cent. of its liabilities. Defendant Mosier was appointed receiver and was yet serving as such when these proceedings were begun and heard.

Among the assets of the bank taken into possession by him as receiver were these two promissory notes:

"$4,000.00.          LAWRENCE, MICH., June 5, 1913.

"30 days after date, for value received, we jointly and severally promise to pay to the order of J. L. Welch & Company, Bankers, four thousand dollars at their bank, with interest at seven per cent. per annum payable annually from date.    Further secured by 100 shares of Detroit Underwriters' Company.

[Signed]    "W. B. SMITH."

Indorsement:

"Interest paid to November 26th, 1913.
"Paid 11-26-13, $1,000.
"Paid 11-26-13, $1,000."

Across the end is written: "84 East Pelmer Street, Detroit, Michigan."

"$1,600.          DOWAGIAC, MICH., Jan. 2, 1914.

"Six months after date I promise to pay to the order of myself sixteen hundred and no-100 dollars at Farmers' & Merchants' Bank, Lawrence, Michigan, value received, 6 per cent. interest from date.    Further secured by stock of Detroit Underwriters' Co., Detroit, Mich.          G. R. HERKIMER."

Also indorsed:  "G. R. Herkimer."

On June 6, 1914, an order for hearing claims on June 25, 1914, was made by the circuit court of Van Buren county, and the same was continued by subsequent orders to November 18, 1914.  The receiver collected $88 of interest on the Herkimer note, but nothing on the Smith note.

On March 13, 1915, W. B. Smith filed his petition herein against the receiver, asserting ownership of the Herkimer note and a claim against the insolvent bank for services rendered under an alleged contract amounting to over $2,400; praying for an accounting, the surrender to him of the Herkimer note, cancellation of his own note, by set-off of sufficient from his claim for that purpose, and allowance of the balance in his favor as a creditor of the bank to be paid by the receiver "in due course of administration."   An an-

swer and amended answer were subsequently filed, a hearing had, and decree rendered by the court, on October 21, 1915, denying petitioner's prayer that his claim for services be allowed and set off against his note and the alleged balance allowed in his favor, but finding him to be owner of the Herkimer note and directing that the same be surrendered to him with the $88 collected thereon.

The services sought to be interposed in liquidation of petitioner's note are claimed to have been rendered the then insolvent bank under the following contract which he testified he drafted and fulfilled on his part, it taking him "about a week very nearly" to procure the subscriptions:

"LAWRENCE, MICH., Dec. 1, 1913.

"This contract made and entered into this the above date, by and between J. L. Welch & Co., Bankers, of Lawrence, Michigan, parties of the first part; and W. B. Smith, of Toledo, Ohio, party of the second part, witnesseth:

"That the said second party agrees to assist the first parties in securing the subscription to a State bank, which is proposed to be organized at Lawrence, Michigan, by J. L. Welch & Co., having a capital stock of thirty-five thousand ($35,000.00) dollars, divided into shares of the par value of one hundred ($100.00) dollars each; said stock to be sold at the price of one hundred and fifty ($150.00) dollars per share, and to be sold to such people as first parties suggest. Said subscription is to be obtained and completed by the said second party on or before February 15, 1914.

"Said first parties are to pay said second party five per cent. (5 per cent.) commission on the sale price of all stock sold by said Smith, excepting that stock which is taken by the first parties.

"Said second party is not to be bound further than to procure the subscriptions in their entirety before February 15, 1914, and to interest in the proposed bank only such people as first parties might select.

"Witness our hands this the above date.

"J. L. WELCH & Co., per J. L. WELCH, Cash.
"W. B. SMITH."

This private banking firm of James L. Welch & Co. was composed of four partners, but Welch was cashier in charge of and running the business; none of the others participating actively, if at all.

Petitioner, Smith, outlines his business experience and career as follows:

"I have been in the insurance business, and have sold quite a little stock, and have been in real estate business, and for 11 years was in the banking business. I was in five or six different banks in different parts of Kentucky, and I have quite a good general knowledge of the business world."

He was for a time engaged in selling stock in Michigan, through that section of the State and elsewhere, and states that when he borrowed the $4,000 from Welch, on June 5, 1913, he had known him three or four years, had carried a checking account with him, and had done $30,000 or $40,000 worth of business with his institution. Welch makes earliest mention of their relations as follows:

"Four years ago Smith sold me some stock in the Detroit National Fire Insurance Company, and at Mr. Smith's request I took over some W. B. Taylor stock and loaned some money on it. I don't remember as Smith said anything about the stock. I knew quite a little about stock at that time. It was considered worth 100 cents on the dollar at that time."

When Smith borrowed the $4,000 represented by the note in question, he received four $1,000 certificates of deposit. He testified he could use these as well as cash, and Mr. Welch did not have all the money to spare at that time, and said, "These certificates I believe were for 12 months each." He cashed two of them in Detroit, and on November 26, 1913, received credit on the note for two of them, which he stated he "took up," paying the interest then due. He and Welch had previously discussed the reorganization of the bank, and shortly after November 26th the con-

tract under which his claim against the insolvent bank is made was signed by Welch, at his home, where Smith, who prepared it, took it to him. Asked as to his knowledge of the financial condition of the bank, he replied that he knew in a general way, not "any more than just hearsay, * * * knew they had lost some money on notes, but didn't think it would aggregate more than about ten or twelve thousand dollars." Pressed upon that inquiry, and asked, "The purpose in changing it over was to save the institution, wasn't it?" he replied: "Well—" "Q. Wasn't that talked over?" "A. I don't know that that was the primary reason." And without further direct answer witness then proceeded to explain that there was a possibility of a demand that private banks be chartered, and it was sought to forestall the possibility rather than to be coerced.

Smith and Welch both testified that the Herkimer note was turned in to the bank to be discounted and sufficient applied to pay Smith's subscription for stock. As before stated, the court ordered that note returned to him by the receiver, with the $88 interest which had been collected upon it.

Included in the list of subscribers for securing which this claim is made appears the names of James L. Welch for 50 shares and W. B. Smith for 10 shares. When soliciting subscribers for stock, Smith represented to them that he was doing it without compensation, which he repeated to the banking commissioner when application was made for approval of the new organization. Certain subscribers, who testified that he so stated to them, asserted that they would not have subscribed had they known that he was to receive a commission of 5 per cent. on the capital stock subscribed for. A witness named Chapman, who was at that time enlisted in the enterprise, and says he signed for his stock "before Smith ever showed up," testified:

"I think I was with Mr. Smith on all his trips during the time he was there.  *  *  *  In all the talk that I heard Mr. Smith have with different people that he visited he said he was doing it free gratis."

And that he told the bank commissioner:

"I am doing it for nothing.  *  *  *  I don't need a license to sell bank stock, from the fact that I am not receiving any fee for it."

Welch testified that he wrote Smith immediately after the bank was closed. Smith stated that he learned of the bank going into the hands of a receiver about 30 days after it occurred. He made no demand for his note of Welch, nor of the receiver, nor filed any claim with the court as a creditor until after March 11, 1915, when counsel for the receiver pressed him for payment. Asked why he did not demand his note when he had secured the subscribers and thereby paid it by earning his commission, as he claimed, he answered, "I should have done it.  *  *  *  I plead carelessness literally."

The plan for reorganization fell through owing, as is claimed, to the unwarranted refusal of the State bank commissioner to approve it. Welch testified that the commissioner refused to sign a charter "because we sold our business at too great a figure," and the commissioner told Smith in Welch's presence something to the effect, that, if he was "the Mr. Smith that has been selling this other stock around the country, I don't want anything to do with any bank that you are connected with." Whatever the merits of this refusal, the attempted reorganization failed, no stock was ever issued or sold, and no benefits resulted to the then insolvent bank from what was done.

It is urged and argued for appellant that the trial court was bound by the undisputed testimony to allow his claim in full for the commission earned under his contract before the receiver was appointed, it being

proved as a debt then due and a proper matter of off-set against any claim in the hands of the receiver who "occupies exactly the same position that J. L. Welch & Co., Bankers, would occupy if no receiver had been appointed and if J. L. Welch & Co. had brought suit on this note and Smith sought to set off his claim for commission against the note in such suit."

Unquestionably, the rule is well settled here and elsewhere that a receiver succeeds only to the title and right to property taken over by him in that capacity which the person, firm, or corporation he is selected to represent had at the time of his appointment, and he takes such property *cum onere*, subject to all exist-ing liens and equities. *Wisconsin, etc., Ins. Co.* v. *Salt & Lumber Co.*, 77 Mich. 76 (43 N. W. 907) ; *Rickman* v. *Rickman*, 180 Mich. 224, 250 (146 N. W. 609, Am. & Eng. Ann. Cas. 1915C, 1237). Appellant has no lien upon any property in the receiver's hands, but claims to have an equitable right of set-off against the debt evidenced by his note. It has been said in an action by a receiver on notes of a defendant that the latter could not set off a judgment against the receiver on a note of the debtor the receiver represents and thereby obtain preference over other creditors (High on Receivers [4th Ed.], § 464), and cases may be found which are not harmonious in all particulars upon that subject; but the great weight of authority sup-ports the rule that choses in action pass to the receiver subject to any existing right of set-off where the coun-terclaims are then due from and to the same persons in the same capacity. *Rothschild* v. *Mack,* 115 N. Y. 1, 9 (21 N. E. 726) ; 34 Cyc. p. 194.

But conceding those general principles urged for ap-pellant, we are impressed that the more serious sub-ject of inquiry in the instant case lies back of them. The burden of proof rests upon appellant to establish his claimed set-off by a preponderance of evidence, and

the facts involved are to be passed upon and decided by the chancery court before which the proceeding is brought. Although Smith and Welch, who negotiated this contract and are the only direct witnesses to the transaction, unite in testimony tending to sustain its validity, sufficient sidelights appear in connection with their testimony to raise misgivings as to its candor and accuracy in various particulars. This bank, which it was proposed to unload upon innocent subscribers as such a sound and safe investment that a premium of 50 per cent. was charged for stock in the new corporation, was in fact tottering and insolvent. Both denied knowledge of this. Welch was its cashier in charge of and running it. Smith himself had been in the banking business, in five or six different banks; his experience in the business world was broad and varied. While selling stock over the State, he had formed Welch's acquaintance, sold him stock, opened an account in his bank, and ingratiated himself into his confidence so that Welch lent him money when he did not have it to spare. Smith represented that they were personal friends who took their outings together.

The tone of this case may be said to indicate that in business experience, tact, and dominant force Welch was not in Smith's class, and in his extremity conceived the idea, or was persuaded, that with Smith's aid he could escape the consequences of his own mismanagement of this bank and profitably dispose of it by a plan of reorganization. Smith testified:

"I had discussed the reorganization of the bank with him for probably a year and a half or two years."

He assumed to know the condition of the bank when soliciting subscribers for stock and asserted it was in a sound and flourishing condition. A subscriber named Christey testified:

"He told me he was working this up for Mr. Welch free gratis, that Mr. Welch was a very warm friend of his, that they had been acquainted some time, and he had camped at the lake with Mr. Welch and he was doing the work and boarding himself. He told me the bank was paying well, that Mr. Welch was making $10,000 a year out of that bank, and that the property was all right. I didn't know the new bank was going to pay $15,000 for the good will. There was nothing said about the good will."

If Smith was telling the truth to the banking commissioner and in his repeated assertions when soliciting subscribers, that he was doing it without compensation and only to help out his friend Welch, he was not doing it to earn a commission under a contract with the Farmers' & Merchants' Bank.

This line of testimony was objected to as immaterial and not admissible under the answer. Permission to amend the answer was granted, the testimony allowed, and an amended answer subsequently filed to cover the objection. It is insisted that this was error and such testimony is incompetent even under the amendment. This is a hearing upon petition before the chancery court upon which testimony was in open court, no claim is made that petitioner was denied opportunity to be fully heard and introduce any testimony desired before the matter was finally disposed of, and we do not discover any abuse of discretion on the part of the trial court which demands correction. *City Bank, etc., Co.* v. *Hurd,* 179 Mich. 454 (146 N. W. 299). The representations made by Smith to subscribers in obtaining their signatures would become material if they were inducing false representations which rendered their signatures of no binding force, and statements he then made contradictory to his testimony in support of the claim at the hearing are clearly competent as bearing on his credibility.

194—Mich.—14.

The subscription paper circulated by Smith, in connection with which the contract should be construed, proposed to organize and incorporate a State bank of $35,000 capitalization, its shares of a par value of $100 each to be sold at $150, the corporation to purchase the business and assets of the private bank of J. L. Welch & Co., including $12,500 for its real estate and fixtures and $15,000 for its good will, or established business, each subscriber to pay "said J. L. Welch & Co., an amount equal to one-half the par value of the stock subscribed by him, or her, such payment to be made on or before January 15, 1915." The paper contains various other provisions relative to payment of balance, perfecting organization, transfer of property from Welch & Co., taking possession, etc.

J. L. Welch & Co. was a banking firm, engaged in that business, and so advertised to the public. Its depositors and creditors did business with and trusted it as such. This contract which, construed as appellant claims, operated to deplete the assets of the partnership over $2,400 without any resulting benefits, was an agreement outside the usual and contemplated scope of its business. In *Barnard* v. *Plank Road Co.*, 6 Mich. 274, 277, it was said:

"No rule is better settled than that one partner cannot bind his copartner by any contract not within the immediate scope of the partnership, unless with such partner's knowledge and consent. Each partner is an agent for all the members of the firm, in the transaction of all business of such firm; but, as to matters foreign to such business, he is regarded as a stranger. The general business of the firm being that of manufacturing lumber, and the ownership of land as incident thereto, the subscription to stock in a corporation, or to articles of association for the creation of one, was not an incident of such partnership. Incidental benefits would not authorize one partner to bind his fellow, and no authority so to bind him is shown."

This rule was sought to be avoided by the testimony of Welch and Smith that other members of the firm knew about the contract and assented to it. Their testimony is general and does not go so far as to directly show that the others ever read it or knew of, or assented to, any provision in it by which their banking partnership would be required to pay Smith over $2,400 if the plan fell through and no corporation was organized to buy their assets and good will. There is no direct testimony that they authorized Welch to sign such a contract, or of their knowledge as to the details of the one he signed.

The evidence is persuasive that the minds of Smith and Welch, who negotiated the contract, never met on the construction now contended for, or that they then so intended it. Both testify that the contract was made in reference to, and in certain anticipation of, the incorporation of a new bank which would buy out the old, and declined to admit that any other contingency was thought of. Although Smith testified that he did not understand his contract as providing he would get no commission unless the stock was sold, and said "I was to get my commission," he stated also, "I knew that stock could not be sold and delivered until after the charter was granted," and upon that subject also answered as follows:

"*Q.* You realized, didn't you, when you were securing those subscriptions, that they would be no good to Welch unless this bank could be organized?

"*A.* I hadn't any doubt about it being organized.

"*Q.* Well, you knew that unless it was organized that the subscription would be worthless?

"*A.* I could not see a possible reason why it could not be organized.

"*The Court:* Now answer the question.

"*A.* I would say, no, I didn't know that.

"*Q.* Didn't you take these subscriptions and have this contract made in contemplation of the fact that this bank would be organized?

"*A.* Without doubt, I contemplated it would be organized."

The concluding paragraph of the contract, upon which Smith relies, provides that he is not "bound further than to procure the subscriptions in their entirety before February 15, 1914," and only to interest in the proposed bank such people as first parties may select; and by the preceding paragraph said first parties are bound no further than "to pay said second party five per cent. commission on the sale of all stock sold by said Smith," excepting that taken by first parties. No time or other terms of payment are mentioned.

In the light of what the contracting parties then had in mind, and all surrounding facts and circumstances, it was equitable, and legally permissible under the language used, for the court to construe this contract as meaning that, while Smith's active obligations in the enterprise bound him no further than obtaining subscribers, his compensation was contingent, and his services in that particular would be, as he stated, "free gratis," unless, and until, stock in the prospective bank was not only subscribed for (which was necessarily on a condition precedent that the bank would be incorporated), but sold.

No occasion is found to disturb the conclusions reached by the trial court, and its decree is affirmed, with costs.

STONE, C. J., and OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred. KUHN, J., did not sit.